# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 6, 2013

## STATE OF TENNESSEE v. JOSHUA SMITH

**Appeal from the Criminal Court for Shelby County**
**No. 1000896    Lee V. Coffee, Judge**

---

**No. W2012-01059-CCA-R3-CD - Filed November 19, 2013**

---

The Defendant-Appellant, Joshua Smith, was convicted by a Shelby County jury of aggravated robbery. He was sentenced as a Range I, standard offender to a term of ten years imprisonment at the Department of Correction to be served at thirty percent. On appeal, the Defendant argues: (1) the trial court improperly denied the Defendant's motion to suppress; (2) the evidence is insufficient to sustain the Defendant's conviction; and (3) the trial court erred in imposing an excessive sentence. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Juni S. Ganguli, on appeal, and Kimkea L. Harris, at trial, for the Defendant-Appellant, Joshua Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Nicole C. Germain, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the robbery of Abou Sy, the victim, by two individuals in the early morning hours of September 29, 2009. The Defendant was implicated in the robbery, and subsequently indicted by the Shelby County Grand Jury.

**Pretrial Motions.** Prior to trial, the Defendant filed a motion to suppress the victim's identification of the Defendant from a photographic lineup, alleging that it was unduly suggestive and the result of police coercion.

At the May 4, 2012 motion to suppress hearing, the victim testified that he was attacked by two men while walking home on September 29, 2009 at approximately 1:30 a.m. He stated that the taller, slimmer man held a gun on him while the other heavier set man went through his pockets. He recalled that neither man wore a mask, but the gunman wore a hat. He stated that although it was dark at the time of the robbery, he was able to see the Defendant's face because the offense took place near a street light. One day after the robbery, a police officer came to the victim's house and showed him a photographic lineup of six pictures. He recalled that the officer fully explained the instructions and told him that the perpetrator may not be in the lineup. The officer did not give the victim any hints or suggestions about who to identify and told Victim that he should not choose anyone unless he was "absolutely sure." The victim testified that he was certain of his identification at the time of the photographic identification and at the suppression hearing.

Sergeant Simpson testified that he compiled the photographic lineup shown to the victim. He explained that the co-defendant in this case, who was arrested prior to the Defendant based on an identification made by the victim, identified the Defendant as the second perpetrator. He stated that he specifically selected photographs of individuals with similar physical traits to the Defendant and used a computer program that arranged the photographic lineup. He affirmed that he advised the victim of the procedure for photographic identifications and did not make any suggestions about who to identify. He stated that he believed that the victim understood the instructions and was certain about his identification of the Defendant in the photographic lineup.

Following the hearing, the trial court made a number of oral findings and conclusions, and denied the motion to suppress. Specifically, the court found that the victim had the opportunity to view and was focused on the Defendant during the robbery. The court also found that the photographic lineup included other individuals with similar physical traits to the Defendant and did not suggest the Defendant over the others. The court acknowledged the conflicting descriptions of the Defendant, but reasoned that "although inconsistencies, or inaccuracy may make the witness a less credible witness, it is within the province of the jury to determine whether or not that witness has been positively identified." The court then summarized its findings and conclusions as follows:

> [T]he Court does find, for the record, that [the Defendant] has been identified by [the victim]. There is nothing in the photograph that would indicate that the photographic spread is tainted, at all. Not a scintilla of

evidence that would indicate that the photographic spread is tainted and the only issue is whether or not his identification by [the victim] is not 100% accurate and again, that is a fact question for a jury to determine. So for those reasons[,] the Court will deny the motion to suppress the out of Court identification.

**Trial.** Abou Sy, the victim in this case, testified that in the early morning hours of September 29, 2009 at approximately 1:30 a.m. he was walking home from friend's house after smoking marijuana when two men, Courtney Williams and the Defendant, approached him and demanded "everything you've got." He stated that Mr. Williams held a gun to his head while the Defendant "did all of the work." The victim wrestled with his attackers and was knocked to the ground where both men began stomping and kicking him. The men removed the victim's shorts, stole his wallet, shoes, and jacket, and ran toward the Village Square Apartments on Winchester Road. The victim went home and told his sisters what happened, and the three got in the car and drove in the direction that the two men fled. The victim saw the men run down Winchester Road carrying his shoes and then enter into a gated apartment complex later determined to be Coventry Apartments. The victim and his sisters approached the security guard at the Coventry Apartments gate, Mario Green, and described the victim's attackers. Mr. Green had seen two men wearing all black and carrying a pair of shoes walk by "pretty fast" and enter an apartment in the complex while he was making his rounds. Mr. Green called the Memphis Police Department and told the victim to wait at the gate. Once police officers arrived, Mr. Green showed officers which apartment he had seen the men enter. The police knocked and were granted permission to enter but did not find the men inside.

Sometime later, while police were talking to the victim, the victim saw one of the perpetrators, Mr. Williams, walk from behind the apartment building with another man. The victim told officers that "that guy right there" was involved but indicated that the man walking with Mr. Williams was not involved. Mr. Williams was arrested at that time. In an initial statement to police, the victim described the second perpetrator as a "fat guy . . . [with] a little fro and [] sideburns, he is short about five-six . . . with brown skin." Mr. Green described the man he saw enter the apartment with Mr. Williams as "heavy set, about five-nine, brown medium skinned, low haircut." The victim later identified the Defendant in a photographic lineup as the second perpetrator. On cross-examination, he conceded that he had smoked marijuana on the day of the robbery and prior to making the identification of the Defendant in the photographic spread but insisted that it had not impacted his ability to remember the Defendant's identity.

Sergeant John Simpson of the Memphis Police Department robbery bureau testified that he compiled a photographic lineup with the Defendant's photograph and showed it to

the victim one day after the robbery. He recalled that the victim identified the Defendant within a few seconds of viewing the lineup and showed no hesitation at all. He did not believe that the victim was under the influence of any substance at the time of the identification and insisted that he would not have shown the victim the photographic lineup if he had been. The police began searching for the Defendant after the victim's identification and the Defendant eventually turned himself in on October 5, 2009. Sergeant Simpson confirmed that the Defendant waived his Miranda rights when he turned himself in and that he never mentioned an alibi during his interrogation. On cross-examination, Sergeant Simpson acknowledged that some witness descriptions of the perpetrator did not match the Defendant but stated that the police "just use that as a guideline" because they are "hardly ever dead on."

Romaria Smith, the sister of the Defendant, testified that in September 2009, the Defendant lived with his father, stepmother, and stepmother's two minor children. She testified that her stepmother, with whom she and the Defendant were very close, passed away on September 15, 2009. After her death, Ms. Smith came over to her father's home almost every day because "everyone was kind of at the house and con[s]oling each other." She recalled that on September 29, 2009, the Defendant got home from work at approximately 7 or 8 p.m. He told her that he was not feeling well and she noticed that he had "this cough that happens around this same time every year." She testified that the Defendant never left the house that night and was still sick the following day. She further testified that the Defendant did not have many friends and that she had never heard of a friend named Courtney Williams. On cross-examination, she conceded that she had just testified that she saw her brother over twelve hours after the alleged robbery occurred, but clarified that she also saw her brother home sick on the evening of September 28.

Terry Smith, the father of the Defendant, testified that he arrived home from work at 11:25 p.m. on September 28, 2009. He recalled that "everybody" was home, including the Defendant and his daughter, Romaria. He testified that the Defendant was sick with a very bad cough that evening and never left his home during the night. He was certain that the Defendant did not leave because he has a "chimer on the door that announces 'door open'. . . [and] it never went off." He also testified that the Defendant usually came home after work and did not go back out, explaining that he was "kind of a loner." He stated that the Defendant had a few friends, but said that he had never heard of a friend named Courtney Williams. On cross-examination, Mr. Smith conceded that he never told the police or anyone at the District Attorney's office about the Defendant's alibi, but explained that he was "never asked."

Justin Dennis, a co-worker of the Defendant, testified that he has known the Defendant for six years, considers him a close friend, and believes he is "an honest person."

When Mr. Dennis heard about the robbery charges, he stated that he "didn't believe it . . . because [] that is not the type of person that [the Defendant] is." He also testified that the Defendant did not have many friends and that he had never heard of Courtney Williams. He recalled that the Defendant left work early on September 28 due to illness, and returned to work the next day but was still sick. On cross-examination, Mr. Dennis conceded that he could not remember other dates that the Defendant had been sick, but explained that he remembered September 28, 2009 because "that was around the last time that [he] [saw the Defendant]." He also acknowledged that he was aware that the Defendant was convicted of unlawful possession of a weapon in 2006, but insisted that he still thought the Defendant was a good and honest person.

The Defendant testified that on September 28, 2009, he left work early around 9:30 p.m. and cancelled plans with his friend, Terrell Johnson, because he was sick. After leaving work, he stopped by a Citgo gas station and then went home to his father's house. He estimated that he arrived home before 10:30 p.m. He testified that he never left the house that evening and returned to work the next day, September 29. He explained that he later heard that the police were looking for him in regards to a robbery and was convinced by family members to go to the Memphis Police Department on October 5, 2009 "since [he] had nothing to hide . . . to get some kind of clarity about this situation." He recalled signing a waiver of his Miranda rights because he "wanted to find out what was going on and, of course, defend [himself], because [] these accusations could not be remotely true." He testified that he was threatened throughout the interrogation by Sergeants Simpson and Michael Rosario and was told that "no matter what [he] said, [he] was guilty, basically." He further testified that he was never asked about an alibi but that he told the officers that he was at home with family members on the night in question. He insisted that he did not know Courtney Williams prior to hearing about the allegations and first met Mr. Williams once in jail. He also stated that he had never seen the victim before other than in courtroom settings related to this charge and was not involved in the robbery in any way.

In rebuttal, the State called Sergeant Michael Rosario. He testified that he participated in the investigation of the robbery in this case and interrogated the Defendant on October 5, 2009. He did not remember the Defendant providing any alibi information and noted that he would have documented such information in his notes had it been given. He further testified that no threats were made during the interrogation and recalled that the interrogation was actually "very light-hearted. . . [because] we didn't have to have a confession to make a case against him" since he had been identified by the co-defendant and the victim. On cross-examination, he acknowledged that the Defendant never expressed unwillingness to speak to officers and agreed that the Defendant told him that he was not involved in the robbery and did not know Courtney Williams.

Based on the evidence presented at trial, the jury convicted the Defendant of aggravated robbery on March 9, 2012. The Defendant filed a motion for a new trial or judgment of acquittal on May 3, 2012. The trial court sentenced the Defendant and entered an order denying the motion for a new trial on May 4, 2012. This appeal followed.

**Sentencing.** At the May 4, 2012 sentencing hearing, the defense called several witnesses to attest to the good character and strong support system of the Defendant. Following the hearing, the trial court considered the statutory enhancement and mitigation factors under Tennessee Code Annotated sections 40-35-113 and -114 and sentenced the Defendant accordingly. The court found two enhancement factors applicable based on the Defendant's prior criminal history and involvement as a leader in the commission of the robbery. Additionally, the court considered the nature and characteristics of the criminal conduct involved in this case in accordance with Tennessee Code Annotated section 40-35-210. The court applied the Defendant's positive work and educational history in mitigation, but ultimately concluded that the enhancement factors outweighed the mitigation factors. Based on the court's findings, the court sentenced the Defendant to ten years to be served at thirty percent in the Department of Correction.

## ANALYSIS

On appeal, the Defendant raises three issues for our consideration: (1) whether the trial court properly denied the Defendant's motion to suppress; (2) whether the evidence is insufficient to sustain the Defendant's conviction; and (3) whether the trial court erred in imposing an excessive sentence. Upon a thorough review of the record, we affirm the judgments of the trial court.

**I. Motion to Suppress.** The Defendant asserts that the trial court should have suppressed the photographic identification of the Defendant because the procedure was impermissibly suggestive and violated his due process rights. He further contends that under the totality of the circumstances, the victim's identification of the Defendant was unreliable given that the victim was under the influence of marijuana at the time of the robbery and during the identification process, was face down during much of the robbery, and gave a conflicting description of the Defendant prior to selecting him in the lineup. The State responds that the photographic identification was not unduly suggestive or unreliable, and the trial court properly admitted the evidence.

An appellate court may consider the proof presented at the suppression hearing and the trial when determining whether the trial court properly denied a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates

otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; Yeargan, 958 S.W.2d at 629.

The Tennessee Supreme Court has held that photographic lineups are admissible unless they are unduly suggestive:

> Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from "suggestive identification procedures." Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). Thus, a photographic identification is admissible unless, based upon the totality of the circumstances, "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301-302, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1206 (1967).

State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998). The risk of an eyewitness making an incorrect identification is greater if the police show the eyewitness a lineup where a single photograph "is in some way emphasized." Simmons v. U.S., 390 U.S. 377, 383 (1968). In addition, the risk of misidentification increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Id. This Court has noted that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar." State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing U.S. v. Wade, 388 U.S. 218, 233 (1967); Shye v. State, 506 S.W.2d 169,

173 (Tenn. Crim. App. 1973); Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)).

In Neil v. Biggers, the Court established a two-part analysis that the trial court must apply in determining the validity of a pre-trial identification. 409 U.S. 188, 198-99 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. Next, if the trial court determines that the identification was unduly suggestive, then it must consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Id. at 199. This Court must consider the following factors in determining the reliability of an identification:

1. the opportunity of the witness to view the criminal at the time of the crime.
2. the witness's degree of attention at the time of the crime.
3. the accuracy of the witness's prior description of the criminal.
4. the level of certainty demonstrated by the witness at the confrontation.
5. the length of time between the crime and the confrontation.

Hall, 976 S.W.2d at 153 (quoting Biggers, 409 U.S. at 199); see State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). In Tennessee, it is unnecessary to apply the totality of the circumstances test in Biggers to assess the reliability of the identification if the trial court determines that the identification procedure was not unduly suggestive. See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

Here, the trial court concluded that there was "nothing that is impermissibly suggestive about the photographic lineup," specifically noting that "nothing about this lineup indicates that [the Defendant] has been improperly placed in a photographic spread . . . [or] indicate[s] that these other folks are dissimilar to [the Defendant]." Notwithstanding this finding, the court also considered the totality of the circumstances and determined that the victim had ample opportunity to view the Defendant and focused on the Defendant during the robbery. It also found that the victim was very certain about his identification at the time of the photographic identification and during the suppression hearing.

Based on our review of the record, we agree with the trial court and conclude that there was nothing unduly suggestive about the photographic lineup or the overall identification process. The photographic lineup contains color photographs of six African American males, all of whom have short hair, similar skin tones, and are wearing earrings. Each photograph is uniform in size with a similar background color. Except for one person, all, including the Defendant, are looking into the camera. The Defendant's head is tilted slightly, but nothing indicates that this aspect drew undue attention to the Defendant's

photograph over the others. Therefore, we conclude that there was nothing about the Defendant's photograph that was "grossly dissimilar" to the photographs of the other men included in the lineup.

Additionally, we agree that the manner of the identification process was not unduly suggestive. Sergeant Simpson showed the photographic lineup to the victim one day after the robbery. He told the victim that the perpetrator's photograph may not even be included in the lineup, and that he should only select an individual if he was certain that he was the other perpetrator. Both the victim and Sergeant Simpson testified that no one influenced or suggested to the victim which photograph to choose. The victim made an identification almost immediately and was certain about his choice at the time of the identification and at trial. Accordingly, we conclude that the record supports the trial court's denial of the motion to suppress the victim's photographic identification of the Defendant. Because we have determined that the identification procedure was not unduly suggestive, we need not assess the reliability of the victim's identification. See Butler, 795 S.W.2d at 686.

**II. Sufficiency of the Evidence.** The Defendant argues that the evidence was insufficient to support his conviction. Specifically, he claims that no rational trier of fact could have convicted him of robbery because of his strong alibi defense and the fact that the victim was under the influence of marijuana at the time of the robbery and when he selected the Defendant in the photographic lineup. The State responds that the evidence is sufficient and any credibility issues raised by the Defendant were properly resolved by the jury.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the

evidence, this Court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This Court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, as relevant here, this Court has held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)). Furthermore, the jury may reject an alibi defense. Crawford, 635 S.W.2d at 705. "The defense of alibi presents an issue of fact determinable by the jury, as the exclusive judges of the credibility of the witnesses in support of the defense, and of the weight to be given their testimony." Id. (citing Green v. State, 512 S.W.2d 641 (Tenn. Crim. App. 1974)).

Here, the Defendant concedes that there is sufficient evidence to establish that a robbery took place. The Defendant contends, however, that the evidence is insufficient to establish his identity as one of the perpetrators of the robbery. We disagree. The Defendant was identified by the victim in a photographic lineup one day after the robbery and again at trial. The victim testified that the Defendant was directly in front of him during the robbery and that he was able to clearly see the Defendant's face because the robbery took place near a street lamp. This testimony, alone, is sufficient to sustain the Defendant's conviction. See Strickland, 885 S.W.2d at 87. The Defendant emphasizes the conflicting witness descriptions of the perpetrator as well as the fact that the victim acknowledged smoking marijuana on the day of the robbery and prior to the photographic identification; however, these facts do not undermine the jury's verdict. The discrepancies in the witness descriptions

and the victim's marijuana use were fully presented to the jury, and the jury resolved any inconsistencies or credibility issues with their verdict. Furthermore, the jury rejected the Defendant's alibi that he was at home sick during the time of the offense, as was their prerogative. We will not reweigh or reevaluate the evidence. See Henley, 960 S.W.2d at 578-79. Accordingly, the Defendant is not entitled to relief on this issue.

**III. Sentencing.** The Defendant contends that the trial court improperly applied the enhancement factors under Tennessee Code Annotated section 40-35-114 and imposed an excessive sentence. The State responds that the sentence is within the appropriate range and the Defendant has failed to show an abuse of discretion by the trial court or overcome the presumption of reasonableness attached to the sentence.

We begin by observing that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this Court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

Here, the trial court's oral sentencing findings show that it thoroughly considered the purposes and principles of the sentencing act before imposing the Defendant's sentence. The court properly determined that the Defendant was a Range I, standard offender and, contrary to the Defendant's assertion in his brief, the court began its analysis at the minimum sentence of eight years. The court applied two enhancement factors based on the Defendant's criminal history and based on his role as a leader in the commission of the offense. The court also applied one mitigation factor, the Defendant's positive work and educational history, but afforded it little weight in comparison to the enhancement factors. It then sentenced the Defendant to ten years, two years less than the maximum sentence in the range of the offense of aggravated robbery. Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of confinement, the Defendant has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded sentences which reflect a proper application of the purposes and principles of our statutory scheme." State v. Caudle, 388 S.W.3d 273, 280 (Tenn. 2012).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE